# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

| | |
|---|---|
| Meetrix IP, LLC,<br><br>Plaintiff,<br><br>v.<br><br>Citrix Systems, Inc., GetGo, Inc.,  LogMeIn, Inc.,<br><br>Defendants. | Civil Action No. 1:16-cv-1033-LY |

## <u>DEFENDANTS' OPENING CLAIM CONSTRUCTION BRIEF</u>

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ................................................................................................ 1

II.    GOVERNING LEGAL PRINCIPLES ............................................................... 2

III.   THE PATENTS-IN-SUIT .................................................................................. 3

IV.   ARGUMENT ...................................................................................................... 5

      A.     "multicast appliances" ........................................................................... 5

      B.     "virtual private networks" and "virtual private network tunnel" ........... 6

      C.     "authenticating" / "authenticated" ...................................................... 12

      D.     Claim 11 of the '997 Patent and its Dependent Claims are Indefinite for Mixing Statutory Classes of Subject Matter ........................................ 13

      E.     "moderator" ......................................................................................... 15

      F.     "A non-transitory computer-readable medium including instructions for a multi-participant conference process to be executed by a local moderator computer" ............................................................................................ 17

      G.     "audio-video [data] stream" & "mixed audio-video data" .................. 19

      H.     "first/second/third mixer" ................................................................... 21

      I.     first/second/third mixed data stream and first/second/third mixed audio data .................................................................................................... 23

V.    CONCLUSION ................................................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*3M Innovative Properties Co. v. Avery Dennison Corp.*,
   350 F.3d 1365 (Fed. Cir. 2003)....................................................................................21

*Bell Atl. Network Servs., Inc. v. Covad Commc'ns Grp., Inc.*,
   262 F.3d 1258 (Fed. Cir. 2001)......................................................................................9

*C.W. Zumbiel Co., Inc. v. Kappos*,
   702 F.3d 1371 (Fed. Cir. 2012)....................................................................................18

*Deere & Co. v. Bush Hog, LLC*,
   703 F.3d 1349 (Fed. Cir. 2012)....................................................................................18

*Gillette Co. v. Energizer Holdings, Inc.*,
   405 F.3d 1367 (Fed. Cir. 2005)....................................................................................21

*H-W Tech., L.C. v. Overstock.com, Inc.*,
   758 F.3d 1329 (Fed. Cir. 2014)....................................................................................14

*Hill-Rom Servs., Inc. v. Stryker Corp.*,
   755 F.3d 1367 (Fed. Cir. 2014)....................................................................................13

*Int'l Biomedical, Ltd. v. Gen. Elec. Co.*,
   No. 1:14-cv-00397-LY, 2015 WL 7431408 (W.D. Tex. Nov. 20, 2015)................................14

*International Rectifier Corp. v. IXYS Corp.*,
   361 F.3d 1363 (Fed. Cir. 2004)....................................................................................20

*IPXL Holdings, L.L.C. v. Amazon.com, Inc.*,
   430 F.3d 1377 (Fed. Cir. 2005)..............................................................................13, 14

*In re Katz Interactive Call Processing Patent Litig.*,
   639 F.3d 1303 (Fed. Cir. 2011)..............................................................................14, 15

*Markman v. Westview Instruments, Inc.*,
   517 U.S. 370 (1996).......................................................................................................2

*NTP, Inc. v. Research In Motion, Ltd.*,
   418 F.3d 1282 (Fed. Cir. 2005)..............................................................................17, 18

*O2 Micro Int'l, Ltd. v. Beyond Innovation Tech. Co.*,
   521 F.3d 1351 (Fed. Cir. 2008)........................................................................... *passim*

*Pause Tech., LLC v. TiVo, Inc.*,
  419 F.3d 1326 (Fed. Cir. 2005)........................................................................................6

*Phillips v. AWH*,
  415 F.3d 1303 (Fed. Cir. 2005) (en banc)................................................................ *passim*

*Pitney Bowes, Inc. v. Hewlett-Packard Co.*,
  182 F.3d 1298 (Fed. Cir. 1999)...............................................................................17, 18

*Poly-Am., L.P. v. GSE Lining Tech., Inc.*,
  383 F.3d 1303 (Fed. Cir. 2004)...................................................................................18

*Rembrandt Data Techs., LP v. AOL, LLC*,
  641 F.3d 1331 (Fed. Cir. 2011)...................................................................................15

*Renishaw PLC v. Marposs Societa' per Azioni*,
  158 F.3d 1243 (Fed. Cir. 1998)................................................................................2, 16

*Vitronics Corp. v Conceptronic, Inc.*,
  90 F.3d 1576 (Fed. Cir. 1996).................................................................................2, 8

## I.      INTRODUCTION

Defendants Citrix Systems, Inc., GetGo, Inc., and LogMeIn, Inc. (collectively "LogMeIn") submit this brief to address the proper constructions of the disputed terms of the three related patents asserted by plaintiff Meetrix IP, LLC ("Meetrix"): U.S. Patent Nos. 8,339,997 ("'997 patent"); 9,094,525 ("'525 patent"); and 9,253,332 ("'332 patent") (collectively, "patents-in-suit").[1]   Meetrix has asserted claims 1, 3-6, and 11-14 of the '997 patent, claims 1-16 of the '525 patent, and claims 1-7 of the '332 patent.  There are nine disputed issues across the thirty-two asserted claims.[2]  LogMeIn addresses the disputes in the order they arise in the asserted claims from the earliest issued patent (the '997 patent) to the latest issued patent (the '332 patent), grouping terms involving similar disputes together.

As this Court has explained, "[t]he patents-in-suit are members of the same patent family and generally relate to audio conferencing over standard telephone networks (called 'public switch telephone networks,' or 'PSTN') along with audio-video conferencing over Internet networks (called 'Internet protocol,' or 'IP,' networks)."   D.I. 54 at 2.  The claimed implementations of this conferencing "include[] the use of generic components, including PSTN, VoIP [Voice Over Internet Protocol], IP, and VPN [Virtual Private Network]."  *Id.* at 5-6.  The crux of the parties' disputes is that, whereas LogMeIn interprets the claims as covering particular ways of implementing conferencing using the well-known generic components, Meetrix seeks to try to stretch its claims to cover essentially any type of conferencing over PSTN and IP networks.  In some cases, Meetrix contends that no construction is needed, seeking to avoid being constrained by any claim construction so that it can argue to a jury that its patent rights

---

[1] The patents-in-suit are attached as Exhibits 1 to 3 to the Declaration of Nathanial McPherson, which accompanies this brief.  All exhibits are attached to that declaration.

[2] After the parties filed the joint claim construction statement, LogMeIn agreed to accept Meetrix's construction of "conferencing server," so this term is not addressed herein.

extend beyond the claim scope the Patent Office allowed.

## II.     GOVERNING LEGAL PRINCIPLES

The Court is well-versed in the legal principles governing claim construction.  Claim construction is the first step of the two-step process of determining whether or not patent claims are infringed (or invalid in light of prior art).  *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 384 (1996).  Claim construction "is an issue for the judge, not the jury."  *Id.* at 391; *see also O2 Micro Int'l, Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008) ("When the parties raise an actual dispute regarding the proper scope of these claims, the court, not the jury, must resolve that dispute.") (citation omitted).

"[T]he words of a claim 'are generally given their ordinary and customary meaning.'" *Phillips v. AWH*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (en banc) (quoting *Vitronics Corp. v Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)).  "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention."  *Id.* at 1313.  "[T]he person of ordinary skill in the art is deemed to [have] read the claim term … in the context of the entire patent."  *Id.*

Often, "the claims themselves provide substantial guidance as to the meaning of particular claim terms."  *Id.* at 1314.  Claims also "must be read in view of the specification," which "is the single best guide to the meaning of the disputed terms."  *Id.* at 1315 (citations and quotations omitted).  Determining the correct claim construction requires "a full understanding of what the inventors actually invented and intended to envelop with the claim" because "[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction."  *Id.* at 1316 (quoting *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998)).  Furthermore, "the prosecution history can often inform the meaning of the claim language by demonstrating

how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be."  *Id.* at 1317.  Finally, although the Federal Circuit has "viewed extrinsic evidence in general as less reliable than the patent and its prosecution history in determining how to read claim terms," it has "authorized district courts to rely on extrinsic evidence" and "has observed that dictionaries and treatises can be useful in claim construction."  *Id.* at 1317-18.

## III.    THE PATENTS-IN-SUIT

As this Court has recognized, the patents-in-suit address conferencing "over hybrid networks," *i.e.*, PSTN and the Internet.  D.I. 54 at 1; *see also* '997 Patent at 1:24-26; 2:8-11.[3] Conferencing systems operating over such hybrid networks using known telecommunications industry standards, *e.g.*, the H.323 standard, existed before the patents-in-suit were filed.  *See id.* at 1:64-65; 2:6-8 ("FIG. 1 is an example of the prior art conferencing system used between hybrid networks connecting the PSTN and Internet.").  In the example of a prior art system shown in Figure 1, there is a centralized "H.323 Network"/"specialized audio/video server 201" directly connected to the Internet-based participants and indirectly connected to the PSTN participants through "Internet H.323 bridges or gateways 411."  *Id.* at 1:65-2:6; 2:18-21; Fig. 1. The patents-in-suit criticize that this prior art approach "require[s] expensive H.323 bridges between dedicated networks and the PSTN," *id.* at 2:11-14, and disclose an approach that purports to avoid the need for expensive bridges and a specialized central server.

Figure 4, copied below, is an example of the alleged invention.  *Id.* at 6:28. In this approach, "audio/video and data may be shared interactively without the need of central servers" and "without the need for special hardware and software during the majority of the network

---

[3] The Background of the Invention and the Detailed Description of the Preferred Embodiment sections of each patent are the same except for minor typographical corrections.  Each patent, however, has a different Summary of the Invention section.

transport." *Id.* at 6:29-36.  These benefits are achieved using "multicasting appliances" 447-457 (colored purple below) that send, *e.g.*, audio, to "multiple client groups who all share the same multicast group address."  *Id.* at 6:29-32.  The multicasting appliances "are used at the origination or termination points for audio, video or data (media data) to form the backbone of the transport path."  *Id.* at 6:41-44.  These appliances are interconnected by a "virtual private network [VPN] 423" comprised of "VPN tunnels" (colored yellow below).  *Id.* at 6:37-41.



*Id.* at Fig. 4 (annotated).  This "decentralized model for multipoint conferencing" "mixes media streams at each terminal prior to multicast," instead of mixing media streams at a specialized central server (as in the prior art).  *Id.* at 5:41-46.

The asserted claims focus on different aspects of this approach.  The asserted '997 patent claims are directed to methods and systems for adding a telephone participant to the conference using the multicast appliances connected over VPNs.  The asserted claims of the '525 patent are directed to systems and software for mixing an audio data stream from a PSTN client and audio-

video data streams from both the moderator and remote client(s).  Finally, the asserted '332 patent claims are directed to methods for receiving audio, video, and collaboration data through a VPN tunnel and mixing the audio data.

## IV.   ARGUMENT

### A.   "multicast appliances"

| Disputed Term[4] | Meetrix's Construction | LogMeIn's Construction |
|---|---|---|
| "multicast appliances" ('997 patent, claims 1, 3, 5, 11, & 13) | devices that provide information destined to multiple locations via a single transmission | devices that use a group address to send information to multiple locations via a single transmission[5] |

The parties agree that "multicast appliances" are devices that transmit information to multiple locations via a single transmission.  The dispute is whether multicast appliances perform this task by *using a group address*.  They do.  The fundamental characteristic of multicast appliances is that they use a group address to send information to a group via a single transmission, according to the multicast protocol.  *See, e.g.* '997 patent at 4:59-67.

Both the claim language and the specification support LogMeIn's construction.  The language of the asserted independent claims is "highly instructive" (*Phillips*, 415 F.3d at 1314) because it recites that "the first message comprises ***a group address*** which identifies a plurality of participants" and "the multicast appliances receiv[e] the first message."[6] '997 patent at cls. 1, 3, & 11.  Thus, although the claims do not explicitly state that the first message is sent to the other multicast appliances by a multicast appliance using a group address, the context of the claim demonstrates that the group address is used.  The specification makes clear that this is, in

---

[4] Independent claims are underlined in this and subsequent tables.

[5] After learning of Meetrix's proposed construction on the day the joint claim construction statement was due, LogMeIn amended its construction to focus the parties' dispute.

[6] All emphasis added unless otherwise noted.

fact, how multicast appliances send data:  "Multicast enabled routing allows remote clients to be PC's or PSTN gateways which become 'Listeners' of media data.  Thus, media data is presented or broadcast onto a network **with one or more group addresses**."  '997 patent at 6:48-52; *see also id.* at 4:59-67 ("configuring the IP packet **with a group address according to a multicast protocol** to create a multicast IP packet … and the appliances providing the multicast data to each of the other participants **in the group address**"); 7:24-26 ("audio is broadcast to multiple audio devices in both IP networks and the PSTN **using a unique group address**").

By contrast, Meetrix's construction improperly would encompass devices, *e.g.* routers and switches, that indiscriminately broadcast information to all connected devices via a single transmission or that send information to multiple locations via a single transmission without using the multicast protocol.   Such an overly broad construction lacks support and thus LogMeIn's well-supported construction should be adopted.  *See Pause Tech., LLC v. TiVo, Inc.*, 419 F.3d 1326, 1333 (Fed. Cir. 2005) ("Because this construction is driven by the use of [the term] in the context of the claim and is supported by the written description, a broader construction that lacks support in the intrinsic record must yield.").

### B.      "virtual private networks" and "virtual private network tunnel"

| Disputed Term | Meetrix's Construction | LogMeIn's Construction |
|---|---|---|
| "virtual private networks" ('997 patent, claims 1, 3, & 11) <br><br> "Virtual Private Network (VPN)" ('525 patent, claims 13 & 14) | "Virtual Private Network (VPN)": an approximation of a private network across a public network using encryption to privatize communication | private network(s) of securely connected appliances across a public network |
| "virtual private network tunnel" ('525 patent, claims 5 & 7) <br><br> "Virtual Private Network (VPN) tunnel" or "VPN tunnel" ('332 patent, claims 1 & 5) | VPN, see above. "tunnel": encapsulation | secure connection between two appliances in a private network across a public network |

The parties agree that "virtual" in a "virtual private network" refers to having a "private network" implemented "across a public network."  The parties dispute (1) whether a "virtual private network" is a network or merely "an approximation" of a network by its use of encryption; (2) whether a "virtual private network" connects appliances or extends to participants' devices, and (3) whether a VPN "tunnel" refers to a connection in the VPN or "encapsulation."  This Court should hold that a "virtual private network" is a network—not some approximation of a network—that connects appliances, reject Meetrix's attempt to equate the "private" nature of the network with "encryption," and interpret a VPN "tunnel" to refer to a "connection" in the VPN rather than "encapsulation."

First, the intrinsic record confirms that a "virtual private network" is a network—not "an approximation of a network," as Meetrix proposes.  The patents-in-suit use the term "network" well over a hundred times in various contexts, but never use the term "approximation" or any similar term to refer to something that resembles a network but is not actually a network.  *See* Ex. 4 ('997 patent with the term "network" highlighted).  The claim terms "virtual private networks"/"Virtual Private Network (VPN)" themselves also provide "substantial guidance" as to the meaning of the term.  *Phillips*, 415 F.3d at 1314.  By their plain language, these terms refer to network(s) that are both "virtual" and "private"—not something that approximates a network.  Similarly, both the claims and the specification refer to establishing "virtual private networks" "across the Internet" "between the multicast appliances," rather than establishing something that is somehow similar to, but not actually, a network.  '997 patent at cls. 1, 3, 11; 4:25-27.

The specification explains that the virtual private network 461 in Figure 3 (copied below) is configured using a "virtual private network bridge 407" to provide "a secure private network." *Id.* at 6:16-20; *see also id.* at 7:44-46 ("As indicated in FIG. 5, the VPN bridge 407 is responsible

for connecting and establishing the virtual private network …."); Fig. 5.



FIG. 3

*Id.* at Fig. 3 (annotated).  The specification confirms that the VPN bridge creates an actual network, stating that the bridge is "at the center of the network topology."  *Id.* at 6:40-41. Furthermore, while the patents-in-suit distinguish a virtual private network from other types of networks, the patents never discuss anything that approximates a virtual private network.  *See* 9:17-20 ("In alternate embodiments the virtual private network may be replaced with either switched dedicated network or standard non-secure IP networks").  Indeed, the patents provide no guidance whatsoever about what an "approximation" of a network might be.  Rather than clarify the meaning of claim terms for the jury, Meetrix's construction would inject greater ambiguity, contrary to the purpose of claim construction, which is to resolve ambiguity based on the intrinsic evidence.  *See Vitronics Corp.*, 90. F.3d at 1583 ("In most situations, an analysis of the intrinsic evidence alone will resolve any ambiguity in a disputed claim term.").

Moreover, Meetrix incorrectly construes a VPN to require "using encryption" to achieve an "approximation of a private network."  This conflicts with the teachings in the specification, which distinguish a VPN from encryption.  The specification teaches that encryption preferably is used *in addition to* a VPN but that a VPN also can be used *without* encryption:  "For security purposes all connections that traverse across the open Internet 435 **are *preferably* secured by the use of encryption running *within* a virtual private network**.[7]  Alternate embodiments **may *exclude* encryption** and [be implemented with] ***virtual private networks including public non-encrypted information***, public Internet interfaces or over private switched networks."  *Id.* at 9:25-31.  Since the specification treats encryption as distinct from VPNs, it would be improper to construe the term VPN as entailing encryption.  *See Bell Atl. Network Servs., Inc. v. Covad Commc'ns Grp., Inc.*, 262 F.3d 1258, 1272-73 (Fed. Cir. 2001) ("the '786 patent specification uses the terms 'mode' and 'rate' to refer to two different and distinct concepts … because the two terms are used separately and distinctly," and thus it was inappropriate to incorporate 'rate' into the construction for 'a plurality of different modes.'").  The claims of the parent of the '997 patent similarly reflect the distinction between a VPN and encryption by nearly identically claiming "establishing a plurality of virtual private networks across the Internet between the multicast appliances" in independent claims 1 and 7, and then adding the feature "encrypting the multicast IP packet" in dependent claims 5 and 8.  Ex. 5, U.S. Patent No. 7,664,056.

Second*,* the claim language and descriptions of the VPNs in the specification also indicate that VPNs securely connect appliances (*i.e.,* modems, routers, or multicast appliances).  Each independent claim of the '997 patent recites that the VPNs are established "across the

---

[7] The reason that encryption is preferably used in addition to a VPN is that the VPN terminates at the appliances, as discussed above, so encryption additionally might be used to secure the communications between the conference participants' computers and the appliances.

Internet routes **between the multicast appliances**." *Id.* at cls. 1, 3, and 11. The specification reiterates, "A plurality of virtual private networks are … established across the Internet between the multicast appliances." *Id.* at 4:25-27. As shown in Figure 4 (copied above), the VPNs (colored yellow) connect the multicast appliances (colored purple). *See id.* at 6:58-67 ("Appliance 447 is connected to a VPN bridge server 407 also by means of a virtual private network.… Connected to the VPN Bridge 407 are various virtual private networks which form network tunnels to one or more other multicasting appliances 449, 451, 453, 455, 457."). These multicasting appliances serve as "the **origination or termination points** for audio, video or data (media data) to from the backbone of the transport path." *Id.* at 6:41-44; *see also id.* at 7:10-12 ("The digital IP is routed via Internet to an appliance 455 **at the edge of the network** …."). Similarly, Figure 3 (copied above) shows the Internet-based clients connected through "routers or modems 453" "in a virtual private network configuration 461." *Id.* at 6:16-17.

Based on these teachings in the intrinsic record that the VPNs terminate at the appliances, LogMeIn asks the Court to construe the term "virtual private network" as "private network(s) of securely connected appliances across a public network." In contrast, by not specifying the endpoints of the network in its construction, Meetrix improperly seeks to embrace networks that extend all the way to the PSTN and Internet-based clients themselves, which is nowhere shown or described anywhere in the intrinsic record. *See Phillips*, 415 F.3d at 1315 (the specification "is the single best guide" a term's meaning.) (citation omitted).

Finally, a VPN "tunnel" refers to a connection in the VPN—not "encapsulation," as Meetrix asserts. The claims and specification consistently use the term "tunnel" to refer to a network connection through which data is transmitted. The '525 patent claims refer to data "transported across a virtual private network tunnel" or "transported through a virtual private

network (VPN) tunnel." '525 patent at cls. 5, 7, 19, & 20.  Similarly, the '332 patent claims refer to data traveling "through" a VPN "tunnel." '332 patent at cls. 1, 5, & 8.  As shown in Figures 3 and 4 (copied above) and described in the specification, each tunnel is a connection between appliances in a VPN.  '997 patent at 6:38-40 ("Each VPN tunnel can be connected … between one or more multicasting appliances"); 6:63-67 ("various virtual private networks … form network tunnels to one or more other multicasting appliances"); 7:13-16 ("The appliance has been configured to have a virtual private network creating a tunnel through Internet to appliance 453 which also has Internet based virtual private tunnels to appliance 457 and appliance 447.").

Meetrix's proposal to construe "tunnel" as "encapsulation" would not work in any of the claims or passages of the specification cited above because data does not travel "across" or "through" an encapsulation, and an encapsulation does not connect appliances through the Internet.   A "tunnel" provides a path for data to travel "across" or "through," whereas "encapsulation" refers to how data is packaged (analogous to an envelope for a letter). Substituting Meetrix's constructions into the claims for the claim terms reciting a VPN tunnel would yield "an approximation of a private network across a public network using encryption to privatize communication" "encapsulation."  This is nonsensical and evidences Meetrix's attempt to try to stretch its claims, in conflict with their plain language, to cover any implementation of conferencing over hybrid networks.

As the patents-in-suit recognize, data can be encapsulated to travel over the public, open Internet even when no VPN tunnels are present.  *See id.* at 4:3-6 ("compressed digitized audio packet data is grouped into multicast packets and **encapsulated for traversal through the open Internet**"); 6:32-36 ("encapsulated media packets are implemented so that media data may be routed through **public** or private IP networks without the need for special hardware and software

- 11 -

during the majority of the network transport").  To overcome a rejection during prosecution,

Meetrix specifically limited its claims by amending them to require a VPN tunnel, rather than

merely an Internet connection, distinguishing the public web from a VPN tunnel.  *See* Ex. 6,

Sept. 15, 2014 Patent Office Rejection at 3-5; Ex 7, Jan. 14, 2015 Amendment at 1, 7.  Meetrix

should not be permitted to use the claim construction process to undo its narrowing of claim

scope during prosecution to secure allowance.  *See Phillips*, 415 F.3d at 1317.

### C.    "authenticating" / "authenticated"

| Disputed Term | Meetrix's Construction | LogMeIn's Construction |
|---|---|---|
| "authenticating" / "authenticated" ('997 patent, claims 1, 3, & 11) | No construction necessary. Or, in the alternative: Establishing authorization. | verifying the identify of / verified |

The parties dispute whether "authenticating" the telephone participant means merely

authorizing the telephone participant to join the conference, as Meetrix proposes, or verifying the

identity of the telephone participant, as LogMeIn proposes.   By its plain language,

"authenticating" means determining that something is authentic, such as verifying a person's

identity—not granting access to something.  *See* Ex. 8, The IEEE Standard Dictionary of

Electrical and Electronic Terms, 6th ed. (1996) at 57 (authentication: "the process of **validating a**

**user** or **process to verify** that the user or process is not counterfeit."); Ex. 9, The Authoritative

Dictionary of IEEE Standards Terms, 7th ed. (2000) at 63 (same); Ex. 10, Webster's New World

College Dictionary 4th ed. (1999) at 95 (authenticate: "1 to make authentic or valid 2 **to**

**establish the truth of; verify** 3 to prove to be genuine or as represented …").[8]  Consistent with

this difference in meaning, the claims recite the step of "the telephone participant providing

---

[8]  *See also Phillips*, 415 F.3d at 1322-23 (courts may rely "on dictionary definitions when
construing claim terms, so long as the dictionary definition does not contradict any definition
found in or ascertained by a reading of the patent document").

conference ID information" to obtain access to the conference separately from the step of "authenticating the telephone participant." '997 patent at cls. 1 & 3; *see also id.* at cl. 11.

Nothing in the intrinsic record evidences that the patentee meant to deviate from the ordinary meaning of "authenticating," and therefore its ordinary meaning applies. *See Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1371 (Fed. Cir. 2014) (noting that the only "two exceptions" to applying the "plain and ordinary meaning" are "(1) when a patentee sets out a definition and acts as his own lexicographer, or (2) when the patentee disavows the full scope of the claim term either in the specification or during prosecution"). A form of the verb "authenticate" is used only once outside the claims, to refer to the VPN bridge 407 being "used to authenticate clients," which is consistent with the well-understood meaning of "authenticate" as "verify the identity of." *Id.* at 6:58-60.

### D.   Claim 11 of the '997 Patent and its Dependent Claims are Indefinite for Mixing Statutory Classes of Subject Matter

Claim 11 of the '997 patent purports to be a system claim. The preamble recites, "A system for adding a telephone participant to a multi-participant audio-video conference, the system comprising ….." '997 patent at cl. 1. However, the body of the claim recites multiple method steps performed by users of the system and components of the system:

- "each of the **multicast appliances receiving** the first message"
- "one or more of the **participants communicating** in the multi-participant video conferences"
- "wherein **the telephone participant provides** a conference ID information"
- "wherein **the telephone participant speaks** in the video conference"

*Id.* Claim 11 thus mixes two different statutory classes of subject matter—an apparatus and a method—and therefore is invalid as indefinite and cannot be construed. *See IPXL Holdings, L.L.C. v. Amazon.com, Inc.*, 430 F.3d 1377, 1384 (Fed. Cir. 2005) (affirming that a system claim

reciting a method step was invalid as indefinite).  Reciting "both a system and the method for using that system" in a claim renders it invalid because "it does not apprise a person of ordinary skill" whether infringement "occurs when one creates a system" "or whether infringement occurs when the user actually uses" the system by performing the claimed method steps.  *Id.*; *see also Int'l Biomedical, Ltd. v. Gen. Elec. Co.*, No. 1:14-cv-00397-LY, 2015 WL 7431408, at *10 (W.D. Tex. Nov. 20, 2015). ("A claim reciting both an apparatus and method for using that apparatus is indefinite if it is unclear when infringement occurs.").

The Federal Circuit has made clear that where (as here) a claim to a system or article includes limitations directed to user actions, that claim is invalid as indefinite.  *See H-W Tech., L.C. v. Overstock.com, Inc.*, 758 F.3d 1329, 1336 (Fed. Cir. 2014) (affirming indefiniteness of a claim to "a tangible computer readable medium" with limitations "*wherein said user completes a transaction with at least one of said merchants listed without the need to generate a voice call*" and "*wherein said user selects one of said variety of offers associated with said one of said merchants listed*") (original emphasis); *IPXL*, 430 F.3d at 1384 (affirming indefiniteness of a claim to an electronic financial system reciting "wherein … *the user uses the input means*") (original emphasis).  Accordingly, the claim limitations reciting user action in system claim 11— "one or more of the participants communicating," "the telephone participant provides," and "the telephone participant speaks"—render claim 11 indefinite.

Claim 11 of the '997 patent closely resembles the claims that the Federal Circuit affirmed were invalid as indefinite in *In re Katz Interactive Call Processing Patent Litig.*, 639 F.3d 1303, 1318 (Fed. Cir. 2011).  Just as claim 11 is directed to having a telephone user interface with a computerized conferencing system, Katz's claims were directed to computerized system for interacting with "individual callers."  *Id.*  In *Katz*, those system claims were invalid as indefinite

because they included the limitations "wherein … callers digitally enter data" and "wherein … callers provide data."  *Id.*  System claim 11 of the '997 patent similarly requires action by telephone users, reciting "one or more of the participants communicating in the multi-participant video conferences," "wherein the telephone participant provides a conference ID," and "wherein "the telephone participant speaks in the video conference."  Therefore, as in *Katz*, claim 11 creates confusion as to when direct infringement occurs—when the system is built or when a telephone participant takes all the claimed actions—and claim 11 is likewise indefinite.  *See id.*

Furthermore, claim 11 recites an additional method step performed by a claimed component:  "each of the multicast appliances receiving the first message."  This claimed method step is likewise impermissible in a system claim and provides another basis for holding claim 11 indefinite.  *See Rembrandt Data Techs., LP v. AOL, LLC*, 641 F.3d 1331, 1339 (Fed. Cir. 2011) (affirming the indefiniteness of claims to a "data transmitting device" that included a method step of "transmitting the trellis encoded frames.").  Claim 11, like the claims at issue in *Rembrandt*, recites an active method step rather than a claimed component's capability to perform that step, and Meetrix cannot redraft the claim to avoid invalidity.  *See id.* at 1339-40.

Therefore, claim 11 and all claims dependent on it (claims 12-18) are invalid.

E.       **"moderator"**

| Disputed Term | Meetrix's Construction | LogMeIn's Construction |
|---|---|---|
| "moderator" ('525 patent, claims <u>1</u>, 5, 9) ('332 patent, claim <u>1</u>, 2, 3 & 5) | No construction necessary. | conference participant equipped to dial out to the PSTN client(s) or have the PSTN client(s) dial into it |

LogMeIn construes the claim term "moderator" so that it is clear how to identify a "moderator" in assessing infringement and invalidity.  The intrinsic evidence identifies the "moderator" as the "conference participant equipped to dial out to the PSTN client(s) or have the

PSTN client(s) dial into it," as opposed to the person who initiates the conference.  Meetrix has not agreed to accept this construction, so there is evidently a dispute to be resolved (*see O2 Micro*, 521 F.3d at 1360), but Meetrix offers no alternative construction.

A PSTN client needs to dial into a conference call or to be connected to the conference call by an IP-based participant's dialing out to the PSTN user.  The specification explains that the moderator is the person with a computer equipped to dial out to a PSTN client or have a PSTN client dial into his or her computer:  "The local moderator client 401 is equipped with proprietary software, as depicted in FIG. 6, to operate as a dial-out to PSTN application.… 'Dial-In' may be used in addition using the same techniques outlined but in a reverse path scenario."  '525 patent at 7:49-56.  The specification focuses on the "dial out" scenario, stating that the moderator connects a PSTN client by dialing out from his or her computer (or terminal). *See, e.g.*, 4:60-64 ("This [Figure 3] embodiment provides the ability for a moderator (single member of the conference) to dial out from a desktop computer or terminal … connecting an external telephone user's audio into the audio/video conference."); 7:17-19 ("The embodiment of FIG. 6 includes a local moderator client 401 who is responsible for initiating a dial out for audio conferencing to the PSTN client 412."); 7:57-8:2.

Accordingly, the moderator is identified in the specification as the person with the computer used to dial out to the PSTN clients or to which the PSTN clients dial in, and therefore LogMeIn's construction is appropriate.  *See Phillips*, 415 F.3d at 1316 ("[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.")  (quoting *Renishaw*, 158 F.3d at 1250).

The patents-in-suit recognize that the moderator can be the person who initiates the conference, or can be a person who calls into a conference which already was initiated.  *See, e.g.,*

*id.* at 5:4-6 ("The voice over IP moderator 401 (call initiator **or caller**) typically has a number of peripherals …."); 7:20-21 ("The local moderator client 401 **may also** be the initiator of the meeting.").[9]   In other words, the moderator can be a different person than the person who initiates a conference, and therefore it would be improper to interpret the "moderator" to be the person who initiates a conference, as Meetrix appears to contend in its infringement contentions.

F.    **"A non-transitory computer-readable medium including instructions for a multi-participant conference process to be executed by a local moderator computer"**

| Disputed Term | Meetrix's Construction | LogMeIn's Construction |
|---|---|---|
| "A non-transitory computer-readable medium including instructions for a multi-participant conference process to be executed by a local moderator computer" ('525 patent, claims 9, 10, 11, 12, 13, 14, 15, & 16) | No construction necessary.  Preamble is not limiting. | Preamble is limiting:  Software application for performing a multi-participant conference, which is persistently stored in a form a computer can read, that is run by a local moderator computer. |

The parties dispute whether the preamble of claim 9 of the '525 patent is limiting.  The preamble of claim 9 is an essential part of the claim and limits the claim accordingly.

A preamble is limiting if it is "necessary to give life, meaning, and vitality" to the claim. *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1305 (Fed. Cir. 1999).  Here, the preamble meets this standard.  If the preamble were not a limitation, then claim 9 would be comprised of a set of method steps and thus would be viewed as a method claim.  The preamble is critical because it establishes that claim 9 is not a method claim, but rather is directed to software by reciting "[a] non-transitory computer-readable medium."  The preamble thus should be construed as claim limitation.  *See NTP, Inc. v. Research In Motion, Ltd.*, 418 F.3d 1282,

---

[9] In the Figure 6 embodiment, it is "**assumed** that the local moderator client 401 has set up the audio video conference with remote audio video clients 418 previous to the dial out for audio conferencing to the PSTN client 412." '525 patent at 8:4-7.

1305 (Fed. Cir. 2005) ("if the preamble helps to determine the scope of the patent claim, then it is construed as part of the claimed invention"); *Pitney Bowes*, 182 F.3d at 1305.

Moreover, "the preamble constitutes a limitation when the claim(s) depend on it for antecedent basis." *C.W. Zumbiel Co., Inc. v. Kappos*, 702 F.3d 1371, 1385 (Fed. Cir. 2012) (holding the preamble limited the claim where "'containers' as recited in the claim body depend[ed] on 'a plurality of containers' in the preamble as an antecedent basis"); *see also Deere & Co. v. Bush Hog, LLC*, 703 F.3d 1349, 1358 (Fed. Cir. 2012) ("a preamble phrase that provides antecedent basis for a claim limitation generally limits the scope of the claim"). Here, the phrase "a local moderator computer" in the preamble provides the antecedent basis for "the local moderator computer" recited in the body of the claim. This reinforces that the preamble limits claim 9. *See Deere & Co.*, 703 F.3d at 1358; *C.W. Zumbiel Co., Inc.*, 702 F.3d at 1385; *NTP*, 418 F.3d at 1306 ("Because these limitations of claim 1 of the '960 patent derive their antecedent basis from the claim 1 preamble and are necessary to provide context for the claim limitations, the use of these limitations in the preamble limits the claim.").

Furthermore, the preamble of claim 9 is limiting because its recitation of software being "executed by a local moderator computer" is "underscored as important by the specification." *Poly-Am., L.P. v. GSE Lining Tech., Inc.*, 383 F.3d 1303, 1310 (Fed. Cir. 2004) (citation omitted). As discussed above, the specification defines the "moderator" as the person having a computer with the software needed to dial out to the PSTN client(s) or have the PSTN client(s) dial into it. *See* '525 patent at 7:49-56. It is important that the software of claim 9 be executed at the local moderator computer because that computer has the necessary capabilities to receive audio data from the PSTN clients and perform the required mixing, as described in connection with Figure 6. *See id.* at 8:48-9:40.

### G. "audio-video [data] stream" & "mixed audio-video data"

| Disputed Term | Meetrix's Construction | LogMeIn's Construction |
|---|---|---|
| "audio-video data stream" / "audio-video stream" ('525 patent, claims <u>1</u>, 2, 4, 5, & 7) | media data transmitted in a continuous fashion | a single stream of combined audio and video data |
| "mixed audio-video data" ('525 patent, claims <u>9</u>, 13, & 15) | No construction necessary | a mix of both audio and video data |

LogMeIn's constructions reflect that, consistent with their plain language, "audio-video data stream"/"audio-video stream" refer to audio and video data present together in a single stream. Similarly, LogMeIn construes "mixed audio-video data" to refer to a mix of both types of data recited in the claim term—audio and video. Meetrix, on the other hand, improperly seeks to broaden the claim terms "audio-video data stream"/"audio-video stream" to cover any type of "media data" and does not require audio and video to travel together in a single stream, contrary to the claims' plain language. Meetrix also apparently disputes LogMeIn's proposed construction of "mixed audio-video data" but, rather than offer an alternative construction, it improperly advocates that the Court not construe the term. S*ee O2 Micro*, 521 F.3d at 1360.

The claims and specification of the '525 patent distinguish between an "audio-video data stream" from the moderator or a remote client, and an "audio data stream" from a PSTN client, which lacks video capability. *See, e.g.*, cl. 1 (*compare* "a remote client audio-video data stream" and "a moderator audio-video data stream" *with* "a Public Switched Telephone Network (PSTN) client audio data stream"); 4:47-5:5 (same). This differentiation indicates that the claim term "audio-video data stream" refers to a stream which contains combined audio and video data, not just audio data. Similarly, the claims and specification distinguish between "mixed audio-video data" for a remote client and "mixed audio data" for a PSTN client. *See, e.g.,*, cl. 9 (*compare* "transmitting the mixed audio-video data to the first remote computer," *with* "transmitting the

compressed mixed audio data to the telephone"); 4:36-5:7 (same).   This distinction likewise indicates that "mixed audio-video data" refers to a mix of both audio and video data.   Indeed, interpreting these claim terms to encompass only audio data would contradict the claims' use of the hyphenated term "audio-video."

Meetrix's proposed construction of "audio-video data stream"/"audio-video stream" as "media data transmitted in a continuous fashion" is wrong for two reasons.   First, the intrinsic record makes clear that "media data" refers to "audio, video, or data" (where "data" presumably refers to collaboration data).   *Id.* at 5:51-53.   Accordingly, media data can refer to just audio, just video, or just another type of data which is neither audio nor video.   The meaning of "media data" is therefore quite different than the meaning of the specific, hyphenated term "audio-video data."   Meetrix made its choice to claim "audio-video"—not "media"—data and cannot undo that choice through claim construction.   *See International Rectifier Corp. v. IXYS Corp.*, 361 F.3d 1363, 1371-73 (Fed. Cir. 2004) ("The patentee, being fully aware of the effects of the doping process, could have claimed the regions more broadly but chose to use the word 'polygonal' without modification or qualification. The district court was not free to attribute new meaning to the term or to excuse the patentee from the consequences of its own word choice.").

Second, the plain meaning of "stream" is different from "in a continuous fashion." Consider two separate chutes that independently and continuously supply salt and sugar to a mixing bowl in an industrial process for making cookies.   Both the salt and sugar are being supplied "in a continuous fashion," but they are being supplied in two separate streams (which can be stopped independently).   Having a stream of salt and sugar would require combining the salt and sugar, and then having them flow down the same chute.   In the same vein, an "audio-video data stream"/"audio-video stream" refers to "a single stream of combined audio and video

data"—not "media data transmitted in a continuous fashion."

### H.        "first/second/third mixer"

| Disputed Term | Meetrix's Construction | LogMeIn's Construction |
|---|---|---|
| "first mixer" ('525 patent, claim 1) | No construction necessary | a mixer that is different from the second mixer |
| "second mixer" ('525 patent, claim 1) | | a mixer that is different from the first mixer |
| "third mixer" ('525 patent, claim 2) | | a mixer that is different from the first and second mixers |

LogMeIn construes the terms "first mixer," "second mixer," and "third mixer" to clarify that these are three different mixers. Meetrix offers no construction, but it evidently disputes this so there is an issue to be resolved by the Court. S*ee O2 Micro*, 521 F.3d at 1360.

The use of terms such as "'first' and 'second' is a common patent-law convention to distinguish between repeated instances of an element or limitation." *3M Innovative Properties Co. v. Avery Dennison Corp*., 350 F.3d 1365, 1371 (Fed. Cir. 2003). In using the terms "first," "second," and "third," Meetrix elected to distinguish the three mixers in its claims. *See Gillette Co. v. Energizer Holdings, Inc.*, 405 F.3d 1367, 1373 (Fed. Cir. 2005) ("The terms 'first, second, and third' are terms to distinguish different elements of the claim …."). If Meetrix had meant to refer to a single "mixer," Meetrix simply could have used the claim term "mixer," but instead Meetrix chose to distinguish the three mixers it claimed. As a result of Meetrix's choice of claim language, claim 1 refers to a system having at least two different mixers. Similarly, claim 2 refers to a system having at least three different mixers. *See id.* at 1371-74 (identifying the three "different blades" Gillette had claimed and holding that its claim reciting "first, second and third" blades could be met by a product having more than three different blades).

The differentiation of the mixers in the claim is consistent with the fact that each claimed mixer mixes different inputs to create a distinct mixed output. The "first mixer" mixes "a Public

Switched Telephone Network (PSTN) client audio data stream with a moderator audio-video data stream into a first mixed data stream"; the "second mixer" "mixes the moderator audio-video data stream with the remote client audio-video data stream into a second mixed data stream"; and the "third mixer" "mixes the audio data from the PSTN client with the audio-video data stream from the remote client into a third mixed data stream."  '525 patent at cls. 1-2.  The Summary of the Invention similarly recites these distinct functions of the first and second mixers, respectively.  *Id.* at 3:47-50; 3:54-56.  Furthermore, the Figure 6 embodiment, which is the embodiment that illustrates how mixing is performed, includes three different mixers labeled "VoIP RecMix" (568), "Mix" (534) and "VoIP PlyMix" (569).  *See* Fig. 6 (circled in red below).



*FIG. 6*

The specification describes these three different mixers as performing distinct functions, as

reflected in the claim language.  *See also id.* at 8:59-9:40; *Phillips*, 415 F.3d at 1315 (the specification "is the single best guide" a term's meaning.) (citation omitted).

### I.    first/second/third mixed data stream and first/second/third mixed audio data

| Disputed Term | Meetrix's Construction | LogMeIn's Construction |
|---|---|---|
| "first mixed data stream" ('525 patent, claim 1) | No construction necessary | data stream that only contains a mix of both the PSTN client audio data stream and the moderator audio-video data stream |
| "second mixed data stream" ('525 patent, claims 1, 6, & 8) | | data stream that only contains a mix of both the moderator audio-video data stream and the remote client audio-video data stream |
| "third mixed data stream" ('525 patent, claim 2) | | data stream that only contains a mix of both the audio data from the PSTN client and the audio-video data stream from the remote client |
| "first mixed audio data" ('332 patent, claims 1 & 6) | No construction necessary | audio data that only contains a mix of both the first audio data from the PSTN client(s) and the second audio data from the moderator |
| "second mixed audio data" ('332 patent, claims 1 & 7) | | audio data that only contains a mix of both second audio data from the moderator and the third audio data from the remote client(s) |
| "third mixed audio data" ('332 patent, claim 2) | | audio data that only contains a mix of both the first audio data from the PSTN client(s) and the third audio data from the remote client(s) |

LogMeIn construes the first/second/third mixed data streams and the first/second/third mixed audio data to address two issues.  First, as discussed above with respect to the first/second/third mixer terms, the use of words "first," "second," and "third" to modify "mixed data stream" and "mixed audio data," respectively, denotes that each of the three mixed data streams/mixed audio data are different.  LogMeIn already has explained the underlying legal

basis for this differentiation above, and this distinction is inherent in LogMeIn's proposed constructions because LogMeIn proposes different constructions for each claim term.

LogMeIn therefore focuses on the second issue here, which is that the mixing described in the patents-in-suit avoids feedback by not including data originating from the recipient of the mix. LogMeIn uses the term "only" in its proposed constructions to reflect the exclusion of the recipient's own data from the mix, thereby avoiding feedback consistent with the disclosure of the patents-in-suit. Meetrix apparently disagrees with LogMeIn's constructions but, rather than propose an alternative, it improperly requests that the Court refrain from construing the terms. *See O2 Micro*, 521 F.3d at 1360.

The claims themselves specify the inputs into the mix for each of the first/second/third mixed data streams/mixed audio data. *See* '525 patent at cl. 1-2; '332 patent at cls. 1-2. LogMeIn's proposed constructions track these literal claim requirements. *Compare, e.g.*, claim 1's recitation of "a first mixer that mixes a Public Switched Telephone Network (PSTN) client audio data stream with a moderator audio-video data stream into a first mixed data stream," *with* LogMeIn's proposed construction of "first mixed data stream": "data stream that only contains a mix of both the PSTN client audio data stream and the moderator audio-video data stream." Thus, LogMeIn's proposed constructions appropriately specify the constituents of each mix.

For each of the first/second/third mixed data streams/mixed audio data, there is a source of data that is *not* part of the mix because that data source is the recipient of the mix. For example, the "first mixed data stream" does not include the "remote client audio-video data stream" because the "first mixed data stream" is transmitted to the "at least one remote client." '525 patent at cl. 1; *see also* '332 patent at cl. 1. Similarly, the "second mixed data stream" does not include the "Public Switched Telephone Network (PSTN) client audio data stream" because

the audio "corresponding to the second mixed data stream" is transmitted "to the PSTN client." *Id.* Finally, the "third mixed data stream" does not include the "moderator audio-video data stream" because that "third mixed data stream" is communicated "to the moderator." '525 patent at cl. 2; *see also* '332 patent at cl. 2. LogMeIn's constructions accordingly include the qualifier "only" to indicate that the data stream that is *not* recited as part of the mix (because it originated from the entity to receive the mix) is, in fact, not contemplated to be a part of the mix. Otherwise, the recipient would suffer feedback by receiving his or her own data (*e.g.*, his or her own voice), thwarting proper operation of the claimed systems.

The specification also supports LogMeIn's construction because it consistently discloses using distinct mixers to mix data from two sources, which never include data from the recipient of the mix. In the first paragraph of the Summary of the Invention, the specification discusses the use of the first mixer to create mixed audio-video data which is transmitted to the remote client, and this mix does not include the remote client's own audio-video data. *See* '525 patent at 3:33-38; *see also id.* at 3:47-52. This paragraph also explains that the second mixer creates mixed audio which is transmitted to the PSTN client, and this mix does not include the PSTN client's own audio data. *See id.* at 3:38-43; *see also id.* at 3:54-59. Mixing is only discussed further in connection with the Figure 6 embodiment, and the specification discloses this same approach to mixing in this embodiment. *See id.* at 8:61-9:40. In sum, for each of the three mixers, the two sources of data which are mixed together do not include the data that originates from the entity to receive the mixed data output. LogMeIn's constructions appropriately reflect this approach, as claimed and disclosed in the specification.

## V.    CONCLUSION

For the foregoing reasons, LogMeIn respectfully requests that the Court adopt its constructions of the disputed claim terms and hold claims 11-18 of the '997 patent invalid.

DATED:  August 17, 2017                    Respectfully submitted,

                                           By: */s/Charles H. Sanders*
                                               Steve Wingard
                                               TX State Bar No. 00788694
                                               swingard@scottdoug.com
                                               Paige Arnette Amstutz
                                               TX State Bar No. 00796136
                                               pamstutz@scottdoug.com
                                               SCOTT, DOUGLASS & MCCONNICO LLP
                                               303 Colorado Street, Suite 2400
                                               Austin, Texas 78701-3234
                                               Tel.: (512) 494-6300
                                               Fax: (512) 495-6399

                                               Charles H. Sanders (*Pro Hac Vice*)
                                               *charles.sanders@lw.com*
                                               William J. Trach (*Pro Hac Vice*)
                                               *william.trach@@lw.com*
                                               Nathanial J. McPherson (*Pro Hac Vice*)
                                               *nathanial.mcpherson@lw.com*
                                               LATHAM & WATKINS LLP
                                               John Hancock Tower, 27th Floor
                                               200 Clarendon Street
                                               Boston, MA 02116
                                               Tel.: (617) 948-6000
                                               Fax: (617) 948-6001

                                               Gabriel K. Bell (*Pro Hac Vice*)
                                               *gabriel.bell@lw.com*
                                               LATHAM & WATKINS LLP
                                               555 Eleventh Street, N.W.
                                               Suite 1000
                                               Washington, D.C. 20004-1304
                                               Tel.: (202) 637-2200
                                               Fax: (202) 637-2201

                                               *Attorneys for Citrix Systems, Inc. and*
                                               *LogMeIn, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing document was filed electronically in compliance with Local Rule 5(b)(2)(E) on August 17, 2017.  As of this date, all counsel of record had consented to electronic service and are being served with a copy of this document through the Court's CM/ECF system under Local Rule 5(b)(2)(E) and by email.


*/s/Steve Wingard*
Steve Wingard