IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

FILED

2017 DEC -1 PM 2: 46

| | | |
|---|---|---|
| MEETRIX IP, LLC | § | |
| PLAINTIFF, | § | |
| | § | |
| V. | § | CAUSE NO. 1:16-CV-1033-LY |
| | § | |
| CITRIX SYSTEMS, INC., | § | |
| GETGO, INC., & LOGMEIN, INC., | § | |
| DEFENDANTS. | § | |

## MEMORANDUM OPINION AND ORDER REGARDING
## CLAIMS CONSTRUCTION

Before the court in the above-styled and numbered cause are Plaintiff Meetrix IP, LLC's

("Meetrix") Opening Claim Construction Brief filed August 16, 2017 (Doc. #59); Defendants'

Opening Claim Construction Brief filed August 17, 2017 (Doc. #60); Plaintiff Meetrix's Reply Claim

Construction Brief filed September 11, 2017 (Doc. #61); Defendants' Responsive Claim Construction

Brief filed September 11, 2017 (Doc. #62); the parties' Amended Joint Claim Construction Statement

filed September 21, 2017 (Doc. #63); and the parties' claim-construction presentations.

The court held a claim-construction hearing on September 25, 2017. *See Markman v.*

*Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996).

After considering the patents and their prosecution history, the parties' claim-construction briefs, the

applicable law regarding claim construction, and argument of counsel, the court now renders its order

with regard to claim construction.

## I.     Introduction

The court renders this memorandum opinion and order to construe the claims of United States

Patent Nos. 9,094,525 ("the '525 Patent"), entitled "Audio-Video Multi-Participant Conference

Systems Using PSTN and Internet Networks"; 9,253,332 ("the '332 patent"), entitled "Voice

Conference Call using PSTN and Internet Networks"; and 8,339,997 ("the '997 Patent"), entitled

"Media Based Collaboration Using Mixed-Mode PSTN and Internet Networks" (collectively "the Asserted Patents"). Meetrix is the owner of the Asserted Patents, which relate to the field of video-conferencing software. The software facilitates conferencing over virtual private networks (VPNs) and the public-switched telephone network (PSTN). The asserted claims relate generally to adding a telephone participant to a multi-participant video conference and mixing audio and video data received from various video-conference participants and transmitting the mixed data to other video-conference participants. Meetrix alleges that Defendants' infringing products and services include Defendant Citrix's GoToMeeting, Defendant LogMeIn's Join.me, and all other substantially similar products and services that provide video conferencing.

## II.     Legal Principles of Claim Construction

Determining infringement is a two-step process. *See Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 384 (1996) ("[There are] two elements of a simple patent case, construing the patent and determining whether infringement occurred . . . ."). First, the meaning and scope of the relevant claims must be ascertained. *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc). Second, the properly construed claims must be compared to the accused device. *Id.* Step one, claim construction, is the current issue before the court.

The court construes patent claims without the aid of a jury. *See id.* at 977–79. The "words of a claim 'are generally given their ordinary and customary meaning.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Vitronics Corp v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Id.* at 1313. The person of ordinary skill in the art is deemed to have read the claim term

in the context of the entire patent. *Id.* Therefore, to ascertain the meaning of a claim, a court must look to the claim, the specification, and the patent's prosecution history. *Id.* at 1314–17; *Markman*, 52 F.3d at 979.

The Federal Circuit has reaffirmed that a departure from the ordinary and customary meaning is the exception, not the rule. *See Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012). There "are only two exceptions to this general rule: 1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution." *Id.*; *see also Augme Techs., Inc. v. Yahoo! Inc.*, 755 F.3d 1326, 1339 (Fed. Cir. 2014) ("Neither the specification nor the prosecution history includes any lexicography or disavowal that would justify a departure from the plain meaning."). "To act as its own lexicographer, a patentee must 'clearly set forth a definition of the disputed claim term,' and 'clearly express an intent to define the term.'" *GE Lighting Solutions, LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014). "It is not enough for a patentee to simply disclose a single embodiment or use a word in the same manner in all embodiments, the patentee must 'clearly express an intent' to redefine the term." *Thorner*, 669 F.3d at 1365.

Claim language guides the court's construction of a claim term. *Phillips*, 415 F.3d at 1314. "[T]he context in which a term is used in the asserted claim can be highly instructive." *Id.* Other claims, asserted and unasserted, can provide additional instruction because "terms are normally used consistently throughout the patent." *Id.* Differences among claims, such as additional limitations in dependent claims, can provide further guidance. *Id.* at 1314–15.

Claims must also be read "in view of the specification, of which they are a part." *Markman*, 52 F.3d at 979. The specification "is always highly relevant to the claim construction analysis.

3

Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Teleflex. Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002) (internal citations omitted). In the specification, a patentee may define a term to have a meaning that differs from the meaning that the term would otherwise possess. *Phillips*, 415 F.3d at 1316. In such a case, the patentee's lexicography governs. *Id.* The specification may also reveal a patentee's intent to disclaim or disavow claim scope. *Id.* Such intention is dispositive of claim construction. *Id.* Although the specification may indicate that a certain embodiment is preferred, a particular embodiment appearing in the specification will not be read into the claim when the claim language is broader than the embodiment. *Electro Med. Sys., S.A. v. Cooper Life Scis., Inc.*, 34 F.3d 1048, 1054 (Fed. Cir. 1994).

The prosecution history is another tool to supply the proper context for claim construction because it demonstrates how the inventor understood the invention. *Phillips*, 415 F.3d at 1317. A patentee may also serve as his own lexicographer and define a disputed term in prosecuting a patent. *Home Diagnostics Inc. v. LifeScan, Inc.*, 381 F.3d 1352, 1356 (Fed. Cir. 2004). Similarly, distinguishing the claimed invention over the prior art during prosecution indicates what a claim does not cover. *Spectrum Int'l v. Sterilite Corp.*, 164 F.3d 1372, 1378–79 (Fed. Cir. 1988). The doctrine of prosecution disclaimer precludes a patentee from recapturing a specific meaning that was previously disclaimed during prosecution. *Omega Eng'g Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003). A disclaimer of claim scope must be clear and unambiguous. *Middleton Inc. v. 3M Co.*, 311 F.3d 1384, 1388 (Fed. Cir. 2002).

Although, "less significant than the intrinsic record in determining the legally operative meaning of claim language," the court may rely on extrinsic evidence to "shed useful light on the relevant art." *Phillips*, 415 F.3d at 1317 (internal quotations omitted). Technical dictionaries and

treatises may help the court understand the underlying technology and the manner in which one skilled in the art might use a claim term, but such sources may also provide overly broad definitions or may not be indicative of how a term is used in the patent. *See id.* at 1318, 1321. Similarly, expert testimony may aid the court in determining the particular meaning of a term in the pertinent field, but "conclusory, unsupported assertions by experts as to the definition of a claim term are not useful." *Id.* at 1318. Generally, extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id.* Extrinsic evidence may be useful when considered in the context of the intrinsic evidence, *id.* at 1319, but it cannot "alter a claim construction dictated by a proper analysis of the intrinsic evidence," *On-Line Techs., Inc. v. Bodenseewerk Perkin-Elmer GmbH*, 386 F.3d 1133, 1139 (Fed. Cir. 2004).

### Indefiniteness

The parties dispute whether claims 11–14 of the '997 patent are invalid as indefinite. A claim is indefinite if it does not reasonably inform a person of ordinary skill in the art of the claim scope. *IPXL Holdings, L.L.C. v. Amazon.com, Inc.*, 430 F.3d 1377, 1383–84 (Fed. Cir. 2005). A claim reciting both an apparatus and a method for using that apparatus is indefinite because it is unclear when infringement occurs. *Id.* at 1384. However, "apparatus claims are not necessarily indefinite for using functional language." *Microprocessor Enhancement Corp. v. Texas Instruments Inc.*, 520 F.3d 1367, 1375 (Fed. Cir. 2008). A claim that is clearly limited to an apparatus "possessing the recited structure and *capable* of performing the recited functions" is not indefinite. *UltimatePointer, LLC v. Nintendo Co., Ltd.*, 816 F.3d 816, 826 (Fed. Cir. 2016) (quoting *Microprocessor*, 520 F.3d at 1375). By contrast, limitations that reflect "activities of the user" rather than "capability of the structure" are likely indefinite. *See id.* at 827; *IPXL Holdings*, 430 F.3d at 1384 (finding a system

claim indefinite because it was unclear whether infringement required user action); *In re Katz Interactive Call Processing Patent Litigation*, 639 F.3d 1303, 1318 (Fed. Cir. 2011) (finding system claims indefinite based on claim language directed to user actions, "wherein . . . callers digitally enter data.").

## III.  Discussion

### A.  *Agreed Constructions*

The parties agree to the construction of one claim term. The court adopts the agreed construction of this claim term, as used in claims 1, 4, and 12 of the '997 patent, as listed in the table below.[1]

| Claim Term/Phrase | Adopted Agreed Construction |
| --- | --- |
| "conferencing server" | **server for managing a conference** |

### B.  *Disputed Terms*

The parties dispute the construction of 9 terms. Each disputed term is discussed separately.

1.  "Multicast appliances"

The parties' proposed constructions of this term, as used in claims 1, 3, 5, 11 and 13 of the '997 Patent, are listed in the following table:

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| Devices that provide information destined to multiple locations via a single transmission | Devices that use a group address to send information to multiple locations via a single transmission |

---

[1] Throughout, the **bolded** claim terms indicate the court's adopted construction.

The parties disagree as to whether multicast appliances use a "group address" to transmit information to multiple locations via a single transmission.

Meetrix argues that Defendants' inclusion of a "group address" is unnecessary to send information to multiple destinations. To support its construction, Meetrix claims that the plain and ordinary meaning of the claims does not require that the multicast appliances use a group address to transmit. Meetrix also asserts that claim differentiation precludes inclusion of the group address in the definition of multicast appliance because group addresses are separately claimed in independent and dependent claims. '997 Patent at claim 15.

Defendants argue that Meetrix's construction improperly encompasses devices that indiscriminately broadcast messages. Defendants contend that the '997 specification uses a group address where it states that multicast information can be "broadcast." '997 Patent at 6:48–52. Defendants also assert that where the '997 specification discusses "multicast," it indicates that multicast is performed using a group address. '997 Patent at 4:59–67, 7:23–27.

To construe "multicast appliances," the court first addresses Meetrix's claim-differentiation argument, then looks to the specification for further guidance. As to claim differentiation, the court agrees that differences among claims can be a "useful guide in understanding the meaning of particular claim terms." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314–15 (Fed. Cir. 2005). The court declines, however, to "apply the doctrine of claim differentiation where, as here, the claims are not otherwise identical in scope." *Indacon, Inc. v. Facebook, Inc.*, 824 F.3d 1352, 1358 (Fed. Cir. 2016). Plaintiff cannot rely on claim 15, for example, to remove a group address from the operation of multicast appliances. Claim 15 contains other scope, including a "gateway" transforming data into "IP packets," that prevents claim 15 from clarifying the meaning of "group address" in other claims.

'997 Patent at claim 15. As claim differentiation does not resolve whether a multicast appliance uses a "group address," the court looks to the teaching of the specification.

The specification "is the single best guide to the meaning of a disputed term." *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002) (internal citations omitted). The '997 specification favors inclusion of a "group address" in the definition of "multicast appliances." The specification consistently teaches that multicast information is transmitted to a limited number of participants. '997 Patent at Figs. 3, 4, and 6. In the '997 specification's summary of the invention, multicast appliances provide "multicast data to . . . participants in the group address." '997 Patent at 4:65–67. The specification further describes configuring information "with a group address according to a multicast protocol." '997 Patent at 4:59–61. Where the specification discusses broadcasting information, it limits recipients to those listed in a group address. '997 Patent at 6:50–51, 7:23–26. Plaintiffs provide no support from the specification for a construction that encompasses broadcasting information without limitation.

Accordingly, the court construes "multicast appliances" as **devices that use a group address to send information to multiple locations via a single transmission**.

2.      "Virtual Private Network (VPN)" and "VPN tunnel"

The parties' proposed constructions of "virtual private network (VPN)", as used in claims 1, 3, and 11 of the '997 Patent and claims 13 and 14 of the '525 patent, as well as the parties proposed constructions of "VPN tunnel," as used in claims 5 and 7 of the '525 patent and claims 1 and 5 of the '332 patent, are listed in the following table:

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| "Virtual Private Network (VPN)" | "Virtual Private Network (VPN)" |
| An approximation of a private network across a public network using encryption to privatize communication | Private networks of securely connected appliances across a public network |
| "virtual private network tunnel" | "virtual private network tunnel" |
| VPN, above. "tunnel": Encapsulation | Secure connection between two appliances in a private network across a public network |

The parties disagree as to the following: (1) whether a VPN is a network or an approximation thereof, (2) whether a VPN must use encryption, and (3) whether a VPN connects "appliances" or extends to participant's devices. The parties further disagree on the meaning of the word "tunnel," with plaintiffs espousing that "tunneling" is synonymous with "encapsulation," and defendants describing a "tunnel" as a connection. The court addresses each disagreement in turn.

Approximation of a network

Meetrix argues that a "virtual private network" (VPN) is an approximation of a private network because of the plain meaning of the word "virtual." Meetrix also appeals to the prosecution history of the '997 patent, which describes a VPN as "a private network that is configured within a public network" and explains that VPNs "enjoy the security of a private network." '997 Patent

Prosecution History at 64, 73–74 (May 3, 2012 IDS and foreign reference WO 03/003665). Meetrix points to an extrinsic definition of "virtual private network" as "nodes on a public network" that communicate "as if the nodes were connected by private lines." MICROSOFT INTERNET AND NETWORKING DICTIONARY 278 (2003).

Defendants argue that a VPN is a network rather than an approximation of a network. The '997 specification uses the term "virtual private network" numerous times, but it nowhere mentions an "approximation" of a network. '997 Patent. Defendants assert that dictionaries cannot be used to contradict intrinsic evidence. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1322–23 (Fed. Cir. 2005). Defendants also contend that Meetrix's dictionary definition, even if relevant, does not reference "an approximation."

The court finds Meetrix's proposed inclusion of "approximation" in the construction of "virtual private network" vague and unnecessary. The specification consistently describes a VPN without the use of the term "approximation" or equivalent language. "Consistent use of a term in a particular way in the specification can inform the proper construction of that term." *Wi-Lan USA, Inc. v. Apple, Inc.*, 830 F.3d 1374, 1382 (Fed. Cir. 2016). Even if relevant, Meetrix's dictionary definition only indicates that a VPN must be secured to communicate privately; it does not support the inclusion of "approximation" in the construction of "virtual private network." Other language in the proposed construction for "virtual private network," describing how a VPN is "configured within" a public network, addresses Meetrix's arguments and evidence without introducing open-ended language unsupported by the intrinsic record.

<u>Encryption</u>

To support inclusion of encryption in the definition of VPN, Meetrix points to the '997 prosecution history, a dictionary definition of "virtual private network," and online descriptions of Defendant Citrix's accused product. The '997 prosecution history includes a reference, submitted in an information disclosure statement (IDS), explaining how "VPNs enjoy the security of a private network via access control and encryption . . . ." '997 Patent Prosecution History at 64, 73–74 (May 3, 2012 IDS and foreign reference WO 03/003665). Defendants argue the specification teaches that encryption is "preferably," but not necessarily, used in a VPN, and that alternate embodiments do not require encryption. '997 Patent at 9:25–31. Defendants allege that the parent of the '997 patent distinguishes encryption from a VPN by including encryption as a separate limitation in dependent claims. Patent 7,664,056 at claims 1 and 5.

The '997 patent claims do not contain the term "encryption." Looking to the '997 specification, it does indicate that encryption may be used in some embodiments but not in others. '997 Patent at 9:25–27 (explaining that connections "are preferably secured by the use of encryption"). Additional language in the specification, however, is not particularly clear as to whether the embodiments that do not use encryption contain a "virtual private network." '997 Patent at 9:28–31 ("Alternate embodiments may exclude encryption and virtual private networks including public non-encrypted information, public internet interfaces or over private switched networks."). The relevant language contains a drafting error that the court cannot resolve with certainty. The specification thus does not clarify whether "alternate embodiments" exclude both encryption and VPNs or exclude only encryption and include VPNs implemented without encryption. The '997 patent uses the term "encryption" only twice, both in the context of the embodiment described above.

*Id.* The '997 specification describes a VPN or communication across the VPN as "secure" however, both in the summary of the invention and in multiple embodiments. *See, e.g.,* '997 Patent at 3:50–51, 6:19–20, 7:44–46.

Given the ambiguity in the specification, the court looks to the prosecution history. As an initial matter, the court notes that "prior art cited in a patent or cited in the prosecution history of the patent constitutes intrinsic evidence." *V-Formation, Inc. v. Benetton Grp. SpA*, 401 F.3d 1307, 1311 (Fed. Cir. 2005). Meetrix's reference to prior art cited in the '997 prosecution history, however, fails to include all relevant content. The reference cited by Meetrix to allege that VPNs require encryption also discusses configuring "VPN access parameters such as traffic classification parameters, performance assurance parameters, or firewall parameters such as encryption, authentication, filtering parameters, etc." '997 Patent Prosecution History at 64, 77 (May 3, 2012 IDS and foreign reference WO 03/003665). The prosecution history thus provides for VPN access control via means other than encryption.

The evidence available in the specification and prosecution history, which describes alternate means of access to the VPN, does not require that a VPN be established using encryption. Describing a VPN as "secure" rather than encrypted accords with the intrinsic record. Less significant extrinsic evidence presented by Meetrix does not rebut the intrinsic record. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1317 (Fed. Cir. 2005). The Microsoft Internet and Networking Dictionary, for example, may not be indicative of how the terms "virtual private network" or "encryption," both of which are amenable to multiple, context-dependent meanings, are used in the patent. *See id.* at 1318. Nor does the court find Meetrix's reference to the Citrix Online Glossary relevant. The "claims may not

be construed with reference to the accused [product]" as a form of extrinsic evidence. *Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.*, 442 F.3d 1322, 1330–31 (Fed. Cir. 2006).

Extent of the "virtual private network"

Meetrix's construction of "virtual private network" contains no indication of the extent of the network, other than its existence "across a public network." Defendants' construction, by contrast, limits the VPN to connecting "appliances" across a public network. Defendants argue that both the claims and the specification teach that VPNs are established "between the multicast appliances." '997 Patent at claims 1, 3, 11, 4:25–27. Defendants point to descriptions of two embodiments specifically. '997 Patent at Figs. 3 and 4. In one embodiment, for example, "virtual private networks . . . form network tunnels to one or more other multicasting appliances." '997 Patent at 6:64–65.

The court agrees with Defendants that a "virtual private network" connects multicast appliances. The claims of the '997 patent consistently label "virtual private networks" as "between the multicast appliances."[2] '997 Patent at claims 1–3, 9, 11. The specification consistently illustrates a VPN terminating at various appliances. '997 patent at Figs. 3 and 4. The court finds no evidence in the claims or specification of a VPN extending beyond the multicast appliances.

VPN "tunnel"

Meetrix argues that a "tunnel" is an "encapsulation" and provides a dictionary definition of the verb "tunnel": "to encapsulate or wrap a packet or a message from one protocol in the packet for another." MICROSOFT COMPUTER DICTIONARY 453 (4th ed. 1999). Defendants argue that a tunnel

---

[2] "Virtual private network (VPN)" and "virtual private network tunnel" are used in claims of the '525 and '332 patents without clarification that the VPN connects multicast appliances. '525 patent at claims 5, 7, 13, and 14; '332 patent at claims 1, 5, and 8.

is a connection in the VPN. Defendants reference instances in the claims where information is transported "through" or "across" a tunnel. '525 Patent at claims 5, 7, 19, and 20; '332 Patent at claims 1, 5, and 8. The '997 specification also indicates that VPN "tunnels" connect multicast appliances. '997 Patent at 6:38–40 ("Each VPN tunnel can be connected . . . between one or more multicasting appliances"); '997 Patent at 7:13–16 ("virtual private tunnels to appliance 457 and appliance 447").

Based on content incorporated by reference in the intrinsic record, the court agrees with Meetrix that a "tunnel" supports "encapsulation." The specification for each patent incorporates by reference International Telecommunications Union Recommendation H.323, titled "Packet Based Multimedia Communication System." *See, e.g.*, '997 Patent at 5:32–34. Documents incorporated by reference are intrinsic evidence for purposes of claim construction. *Sys. Div., Inc. v. Teknek LLC*, 59 F. App'x 333, 340 (Fed. Cir. 2003). The recommendation describes a "process, known as 'encapsulation' or 'tunnelling' . . . of messages" in which one type of message is encapsulated in a second type of message so that it can be sent over a channel configured for the second type of message. INTERNATIONAL TELECOMMUNICATION UNION, RECOMMENDATION H.323: PACKET BASED MULTIMEDIA COMMUNICATION SYSTEM (2000) [H.323 Recommendation].

Since a "tunnel" that allows encapsulated data is consistent with describing a tunnel as a connection, Defendants' arguments that a tunnel is a connection are compatible with this construction. For example, the '997 specification discusses how "multicast protocol and encapsulated media packets are implemented so that media data may be routed through . . . networks" (that is, encapsulated data may be sent "through" a tunnel). '997 Patent at 6:32–35.

14

In the court's view, however, swapping the term "encapsulation" for the word "tunnel" does not clarify the meaning and scope of the claims. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (reiterating that claim construction determines meaning and scope of claims). The court accordingly defines the term "encapsulation," based on the available evidence, as encapsulating a packet from one protocol in a packet from another protocol. *See, e.g.*, '997 Patent at claim 16 (containing a "multicast IP packet being encapsulated as a unicast packet").

For the reasons discussed above, the court construes "virtual private network" as **a private network of securely connected appliances configured within a public network** and a VPN "tunnel" as **a connection between two devices that permits encapsulating a first packet from one protocol in a second packet from a different protocol**.

3.      "Authenticating" and "authenticated"

The parties' proposed constructions of this term, as used in claims 1, 3, and 11 of the '997 Patent, are listed in the following table:

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| No construction necessary<br><br>Or, in the alternative:<br>Establishing authorization | Verifying the identity of / verified |

The parties' dispute over the term "authentication" actually turns on whether the "authentication" includes use of the "conference ID" referenced in claims 1, 3, and 11 of the '997 patent. Meetrix argues that "authentication" should be read as "establishing authorization" because in claims 1, 3, and 11 of the '997 patent, "authenticating" the "conference ID information" that a participant provides authorizes the participant to join the video-conference.

15

Defendants contend that nothing in the intrinsic record indicates patentee intent to deviate from the ordinary meaning of "authenticating" and that Meetrix's construction of "establishing authorization" contradicts this ordinary meaning. Defendants argue that the claims distinguish between an authorizing step (where the participant provides a "conference ID") and an "authentication" step (where the participant's identity is verified).

A court may depart from the plain and ordinary meaning of a claim term in only two instances: lexicography and disavowal. *Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1371 (Fed. Cir. 2014).

> [A]bsent some language in the specification or prosecution history suggesting that the [limiting feature] is important, essential, necessary, or the "present invention," there is no basis to narrow the plain and ordinary meaning of the term . . . . There are no magic words that must be used, but to deviate from the plain and ordinary meaning of a claim term to one of skill in the art, the patentee must, with some language, indicate a clear intent to do so in the patent.

*Hill-Rom*, 755 F.3d at 1373.

The court finds no intrinsic evidence that justifies departing from the plain and ordinary meaning of "authentication." The claims provide no indication, one way or another, as to whether the "authenticating" uses "conference ID information," some other information, or a combination of the two. Nor does the court find a clear intent to deviate from the plain and ordinary meaning of "authentication" in the specification or prosecution history. The specification only mentions the term "authenticate" once, with little context. '997 Patent at 6:58–59 ("The VPN Bridge 407 is used to authenticate clients . . ."). The intrinsic record, which contains no evidence of lexicography or disavowal, indicates that "authentication" should be given its plain and ordinary meaning.

A construction relying on plain and ordinary meaning may be inadequate, however, "where a term's ordinary meaning does not resolve the parties' dispute." *Eon Corp. IP Holdings LLC v.*

*Silver Springs Networks, Inc.*, 815 F.3d 1314, 1318 (Fed. Cir. 2016) (internal quotations omitted).

Here, the plain meaning of authenticate does not resolve the parties' dispute, because Meetrix asserts

that no construction is needed and Defendants assert that the plain meaning can be ascertained from

dictionaries. Given little to no intrinsic evidence, the court looks to extrinsic evidence to establish the

plain and ordinary meaning of "authenticate." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1318 (Fed.

Cir. 2005); *see Sociedad Espanola de Electromedicina y Calidad, S.A. v. Blue Ridge X-Ray Co.*, 621

F. App'x 644, 648 (Fed. Cir. 2015) (consulting dictionary to confirm plain and ordinary meaning of

claim term); *Zircon Corp. v. Stanley Black & Decker, Inc.*, 452 F. App'x 966, 973 (Fed. Cir. 2011)

(assessing plain and ordinary meaning of "ratio" in light of dictionary definitions).

Consulting the dictionaries referenced by both parties, the court concludes that "authenticate"

is to be given its **plain and ordinary meaning**, defined as **to verify the authenticity of**.

> 4.  Definiteness of Claims 11–14: "the system comprising . . . each of the multicast appliances receiving the first message . . . one or more of the participants communicating . . . the telephone participant provides . . . the telephone participant speaks . . . ."

The parties dispute whether claims 11–14 of the '997 patent are indefinite as directed to more

than one statutory class of subject matter.

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Not indefinite. | Indefinite as directed to more than one statutory class of subject matter, i.e., a system and a method. |

Defendants argue that, since claim 11 recites both an apparatus and a method for using that

apparatus, it is unclear when infringement of claim 11 occurs, and claim 11 is indefinite. *Int'l*

*Biomedical, Ltd v. Gen. Elec. Co.*, No 1:14-cv-00397-LY, 2015 WL 7431408, at *10 (W.D. Tex.

17

Nov. 20, 2015). Meetrix argues that, since the language of claim 11 merely describes the capabilities of the claimed system, claim 11 is sufficiently definite.

A claim reciting both an apparatus or system and a method for using that apparatus is indefinite because it is unclear when infringement occurs. *IPXL Holdings, L.L.C. v. Amazon.com, Inc.*, 430 F.3d 1377, 1384 (Fed. Cir. 2005). However, "apparatus claims are not necessarily indefinite for using functional language." *Microprocessor Enhancement Corp. v. Texas Instruments Inc.*, 520 F.3d 1367, 1375 (Fed. Cir. 2008). A claim that is clearly limited to an apparatus "possessing the recited structure and *capable* of performing the recited functions" is not indefinite. *UltimatePointer, LLC v. Nintendo Co., Ltd.*, 816 F.3d 816, 826 (Fed. Cir. 2016) (quoting *Microprocessor*, 520 F.3d at 1375). By contrast, limitations that reflect "activities of the user," rather than "capability of the structure," are likely indefinite. *See id.* at 827; *IPXL Holdings*, 430 F.3d at 1384 (finding system claim indefinite because it was unclear whether infringement required user action); *In re Katz Interactive Call Processing Patent Litigation*, 639 F.3d 1303, 1318 (Fed. Cir. 2011).

Plaintiff's appeal to *Biosig Instruments, Inc. v. Nautilus, Inc.*, in which functional claim language describes a structure, is inapt here, where the claim language describes a participant's action in a system. 783 F.3d 1374, 1384 (Fed. Cir. 2015). This is not a case in which "the functional language of the claim merely describes the structure and capabilities of the claimed [system]." *SFA Systems, LLC v. 1-800-Flowers.com, Inc.*, 940 F.Supp.2d 433, 454 (E.D. Tex. 2013). The court finds the language in claim 11 "directed to user actions, not system capabilities." *See UltimatePointer, LLC v. Nintendo Co., Ltd.*, 816 F.3d 816, 827 (Fed. Cir. 2016). The limitation "one or more of the participants communicating in the multi-participant video conferences," for example,

only indicates user action—the communication itself—rather than system capabilities—enabling participants to communicate.

Other language in claim 11 is indistinguishable from claim language that the Federal Circuit found indefinite in *In re Katz*. *Compare* '997 Patent at claim 11 ("wherein the telephone participant provides a conference ID information") *with In re Katz Interactive Call Processing Patent Litigation*, 639 F.3d 1303, 1318 (Fed. Cir. 2011) ("wherein . . . callers digitally enter data"). Comparison with other claims in the '997 patent also clarifies that claim 11 is directed to user action. Claim 1, for example, contains functional language indicating system capability, but such language is conspicuously absent from claim 11. '997 Patent at claim 1 ("*enabling* at least one of the participants to communicate in the multi-participant video conferences") (emphasis added). The court declines to read clearly omitted functional language into the claims. *See Int'l Rectifier Corp. v. IXYS Corp.*, 361 F.3d 1363, 1372 (Fed. Cir. 2004) (denying district court freedom to "to excuse the patentee from the consequences of its own word choice").

The court concludes that claim 11 of the '997 patent is **indefinite**.

5.      "Moderator"

The parties' proposed constructions of this term, as used in claims 1, 5, and 9 of the '525 patent and claims 1, 2, 3 and 5 of the '332 Patent, are listed in the following table:

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| No construction necessary. | Conference participant equipped to dial out to the PSTN client(s) or have the PSTN client(s) dial into it. |

Defendants argue that the "moderator" should be limited to the conference participant equipped to dial out to the public-switched telephone network (PSTN) client or have the PSTN client

dial into it. Defendants' argument rests on a description of one embodiment in which the "local moderator client" is "responsible for initiating a dial out . . . to the PSTN client." '525 Patent at 7:17–20. In further description of the same embodiment, the "local moderator client" is "equipped with proprietary software . . . to operate as a dial-out to PSTN application." '525 Patent at 7:49–51.

Meetrix argues that a jury will understand the meaning of the term "moderator." Meetrix points to language in the specification of the '332 patent referring to the moderator as a "call initiator or caller." '525 Patent at 5:4–5. Meetrix also argues that Defendants' proposed language is only described in one "exemplary embodiment." '525 Patent at 7:21–22.

The court agrees with Meetrix. A court may depart from the plain and ordinary meaning of a claim term in only two instances: lexicography and disavowal. *Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1371 (Fed. Cir. 2014).

> [A]bsent some language in the specification or prosecution history suggesting that the [limiting feature] is important, essential, necessary, or the "present invention," there is no basis to narrow the plain and ordinary meaning of the term . . . . There are no magic words that must be used, but to deviate from the plain and ordinary meaning of a claim term to one of skill in the art, the patentee must, with some language, indicate a clear intent to do so in the patent.

*Hill-Rom*, 755 F.3d at 1373.

The court does not find a clear intent, via lexicography or disavowal, to deviate from the plain and ordinary meaning of "moderator." Furthermore, "it is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." *Epos Techs. Ltd. v. Pegasus Techs. Ltd.*, 766 F.3d 1338, 1341 (Fed. Cir. 2014); *see also Hill-Rom*, 755 F.3d at 1371 ("[W]e do not read limitations from the embodiments in the specification into the claims."). Defendants' description of features limited to a single embodiment is insufficient

to justify reading those features into the claims. The court finds that the specification does not support a construction of this term in a way other than the plain and ordinary meaning of the words as they would be understood by a lay person, much less one of ordinary skill in the art.

The court concludes that **no construction of the claim term is necessary**.

6. Preamble: "A non-transitory computer-readable medium including instructions for a multi-participant conference process to be executed by a local moderator computer"

The parties agreed at the claims-construction hearing that the preamble is limiting; however, Meetrix disputed two aspects of Defendants' proposed construction. First, Meetrix asserts that claim 9 does not require the "local moderator computer" to actually run the software. Second, Meetrix argues that Defendants' proposed construction requires a complete "software application" while the preamble of claim 9 does not.

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Preamble is limiting, but does not require a "software application" or actual execution by a computer. | Preamble is limiting: Software application for performing a multi-participant conference, which is persistently stored in a form a computer can read, that is run by a local moderator computer. |

Looking to claim 9 as written, the court agrees with Meetrix that a plain reading of the terms in claim 9 of the '525 patent does not require these aspects of Defendants' proposed construction. Claim 9 describes "instructions" rather than an "application," and "to be executed" indicates capability to execute rather than actual execution of the instructions. The '525 specification, silent regarding any "non-transitory computer-readable medium," adds no further clarity.

The court construes the preamble, "[a] non-transitory computer-readable medium including instructions for a multi-participant conference process to be executed by a local moderator

computer," as **software instructions for performing a multi-participant conference, which are persistently stored in a form that a local moderator computer can read and execute**. This preamble limits the process steps in claim 9 of the '525 patent as well as process steps in dependent claims 10–16.

7.    "Audio-video data stream" / "audio-video stream" / "mixed audio-video data"

The parties' proposed constructions of these terms, as used in claims 1, 2, 4, 5, 7, 9, 13, and 15 of the '525 Patent, are listed in the following table:

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "Audio-video data stream" / "audio-video stream" | "Audio-video data stream" / "audio-video stream" |
| Media data transmitted in a continuous fashion. | A single stream of combined audio and video data. |
| "mixed audio-video data" | "mixed audio-video data" |
| No construction necessary. | A mix of both audio and video data. |

Defendants assert that "audio-video data" is not "media data." Defendants allege that the specification describes "media data" as broader than "audio-video data." '525 Patent at 5:39 ("audio/video and data may be shared"), 5:51–52 ("audio, video, or data (media data)"). Defendants note instances where "audio data, video data, and collaboration data"— all of which are included in "media data"—are distinguished from one another. '332 Patent at claim 1. Defendants argue that instead of "media data," "audio-video data" refers to "combined audio and video data." In Defendants' view, the claims distinguish between an "audio-video data stream"—audio and video— and an "audio data stream"—audio only. '525 Patent at claim 1 (mixing a "Public Switched Telephone Network (PSTN) client *audio* data stream with a moderator *audio-video* data stream,"

22

mixing "a moderator *audio-video* data stream" with a "remote client *audio-video* data stream into a second mixed data stream," and then describing "a mixed *audio* data stream, corresponding to the second mixed data stream") (emphasis added). Defendants contend that Meetrix's construction allowing "audio-video data" to include only audio data or only video data is improper, as it depends solely on an "exemplary embodiment" that omits the video path "[f]or simplicity of illustration." '525 Patent at 7:11–22. Defendants also argue that "audio-video data stream" refers to a single stream and that a "stream" is well-understood and need not be construed.

Meetrix proposes that the '525 specification teaches that "audio-video data" is "media data." In Meetrix's definition, media data can contain audio data, video data, or other data. '525 Patent at 5:49–52. Pointing to the same portion of the specification as Defendants, Meetrix highlights that the system allows "audio/video *and data* [to] be shared." '525 Patent at 5:39 (emphasis added). The embodiment also describes how "multicasting enabled appliances . . . are used . . . for audio, video, *or data (media data)* . . . ." '525 Patent at 5:49–52 (emphasis added). Meetrix implies that since the appliances in the specification can use "media data," the "audio-video data" in the claims should be read as "media data."

Meetrix also disputes Defendants' requirement that audio data and video data be combined. Meetrix points to an embodiment in the '525 specification in which only audio data is mixed. '525 Patent at 9:13–20 ("The audio encoder 520a combines the PSTN client 412 audio with the local moderator clients 401 audio . . . ."). Finally, Meetrix denies that "audio-video data stream" is limited to a single stream, as Defendants' construction requires. Meetrix notes that in the claims the article "a" consistently precedes the term "audio-video data stream" (for instance, in "a moderator audio-video data stream"). Meetrix argues that "a" means "one or more." *Baldwin Graphic Sys., Inc. v.*

*Siebert, Inc.*, 512 F.3d 1338, 1342 (Fed. Cir. 2008). Meetrix also presents a dictionary defining "stream" as "any data transmission . . . that occurs in a continuous flow." MICROSOFT INTERNET AND NETWORKING DICTIONARY 243 (2003).

The court agrees with Defendants that "audio-video data" does not encompass "media data." A plain reading of the specification clearly indicates that "media data" contains broader scope than just "audio-video data." Meetrix's appeal to a single embodiment is not to the contrary. '525 Patent at 5:39–52. Even were the court to favor Meetrix's interpretation of this embodiment, it cannot read language from a single embodiment into the claims. *See Nazomi Comm'ns, Inc. v. ARM Holdings, PLC*, 403 F.3d 1364, 1369 (Fed. Cir. 2005) (noting that claims may embrace "different subject matter than is illustrated in the specific embodiments in the specification"). Mere use of the term "media data" in the specification does not read "media data" into the claims. The claims do not use the term "media data," and where they include other forms of data other than audio or video, such inclusion is explicit. '525 Patent at claims 9, 17 (including "collaboration data"); *see also* '332 Patent at claim 1 (receiving "audio data, video data, and collaboration data"). The court is not free to attribute new meaning to the term "audio-video data" in order to excuse Meetrix from the consequences of the claims' word choice. *Int'l Rectifier Corp. v. IXYS Corp.*, 361 F.3d 1363, 1372 (Fed. Cir. 2004).

The question then becomes whether "audio-video" refers to audio and video, audio or video, or audio and/or video. Finding no broad rule for either a conjunctive or disjunctive reading of the hyphen in "audio-video," the court looks to the intrinsic evidence. *See Apple Computer v. Burst.com, Inc.*, No. C 06-00019 MHP, 2007 WL 1342504, at *14 (N.D. Cal. May 8, 2007) (construing, based on intrinsic evidence, "audio/video source information" as "an audio and/or video work ..."); *Acacia Media Techs. Corp. v. New Destiny Internet Grp.*, No. C 05-01114, 2007 WL 678317, at *10–11

24

(N.D. Cal. Mar. 2, 2007) (finding corresponding structure for means-plus-function term that describes "audio/video information" as "audio and/or video information"). The intrinsic record in this case supports construing "audio-video data" as audio and video data. Separate use of "audio data" in claims 1 and 9 of the '525 patent, which indicates that "audio data" is different from and must be separated out of "audio-video data," favors including both audio and video data in "audio-video data." '525 Patent at claims 1 and 9. The '525 specification corroborates this construction. It does not mention "audio and/or video" data, and examples manipulating only audio data refer to "audio," not "audio-video data." '525 Patent at 6:10–30.

The court agrees with Meetrix that a "stream" refers to data transmitted in a continuous fashion. Although the main body of the specification uses "stream" numerous times without definition, the H.323 Recommendation (incorporated by reference) defines an "information stream" as "[a] flow of information of a specific media type (e.g. audio) from a single source to one or more destinations." H.323 Recommendation at 7; '992 Patent at 5:32–34. The extrinsic evidence corroborates this definition. MICROSOFT INTERNET AND NETWORKING DICTIONARY 243 (2003).

For the reasons outlined above, the court construes an "audio-video data stream," or an "audio-video stream" as **audio and video data transmitted together in a continuous fashion**. The court construes "mixed audio-video data" as **a mix of both audio and video data**.

25

8. "First / second / third mixer" terms

The parties' proposed constructions of these terms, as used in claims 1 and 2 of the '525 Patent, are listed in the following table:

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| No construction necessary. | "first mixer"<br>A mixer that is different from the second mixer<br><br>"second mixer"<br>A mixer that is different from the first mixer<br><br>"third mixer"<br>A mixer that is different from the first and second mixers |

The parties dispute whether the meaning of the terms is apparent from the claim language and whether the three mixers must be "different" mixers. Defendants assert that "the terms 'first, second, and third,' are terms to distinguish different elements of the claim." *Gillette Co. v. Energizer Holdings, Inc.*, 405 F.3d 1367, 1373 (Fed. Cir. 2005). Defendants also point out that each mixer performs a different function. '525 Patent at claims 1 and 2. Finally, Defendants note that the '525 specification separates each mixer into its own structure. '525 Patent at Fig. 6.

Meetrix asserts that use of the terms "first" and "second" is a common patent-law convention to distinguish between "repeated instances of an element or limitation." *3M Innovative Properties Co. v. Avery Dennison Corp.*, 350 F.3d 1365, 1371 (Fed. Cir. 2003). Meetrix states that ordinal modifiers "delineate multiple instances of the same or similar structure." *Stone Basket Innovations LLC v. Cook Med. LLC*, No. 2:15-CV-464-JRG-RSP, 2016 WL 1182926, at *5 (E.D. Tex. Mar. 28,

2016). Plaintiff argues that nothing in these conventions or the '525 specification requires the mixers to be *physically* distinct.

The parties seem to misunderstand each other's arguments. Meetrix appears to believe, incorrectly, that Defendants' construction requires the mixers to be *physically* different. Defendants appear to believe, incorrectly, that Meetrix's proposal for no construction would require only *one* mixer despite the use of ordinal modifiers in the claims. Much of the present confusion hinges on the meaning of the word "different": does "different" refer to (1) a different "instance" of the same or similar type of structure (for example, copy and paste a mixer to create two), (2) a different "instance" of a different type of structure (for example, two mixers of different designs), or (3) different uses of the same structure (for example, one mixer performing different functions)? The cases discussed support the proposition that ordinal modifiers refer to additional instances of similar structure, but they elaborate little on the degree of similarity required. Attempts to read more from the *Gillette*, *3M Innovative Properties*, or *Stone Basket Innovations* cases overreach.

It is sufficient that the ordinal modifiers in claims 1 and 2 of the '525 patent require that the mixers must be different "instances of the same or similar structure." *Stone Basket Innovations*, 2016 WL 1182926 at *5. The '525 specification explicitly declines to define whether these different instances are physically implemented in hardware or in software. '525 Patent at 7:39–43 and Figure 6.

The court accordingly construes the terms as follows: a "first mixer" is **a mixer that is not the second or third mixers,** a "second mixer" is **a mixer that is not the first or third mixers**, and a "third mixer" is **a mixer that is not the first or second mixers**. This construction accords with

patent-law conventions for ordinal modifiers, is consistent with each mixer mixing different data as in '525 patent claims 1 and 2, and avoids the potential for conflicting readings of the word "different."

9.      "first / second / third mixed data streams" and "first / second / third mixed audio data"

The parties' proposed constructions of these terms, as used in claims 1, 2, 6, 7, and 8 of the '525 Patent, are listed in the following table:

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| No construction necessary. | "first mixed data stream"<br>Data stream that only contains a mix of both the PSTN client audio data stream and the moderator audio-video data stream<br><br>"second mixed data stream"<br>Data stream that only contains a mix of both the moderator audio-video data stream and the remote client audio-video data stream<br><br>"third mixed data stream"<br>Data stream that only contains a mix of both the audio data from the PSTN client and the audio-video data stream from the remote client<br><br>"first mixed audio data"<br>Audio data that only contains a mix of both the first audio data from the PSTN client(s) and the second audio data from the moderator<br><br>"second mixed audio data"<br>Audio data that only contains a mix of both second audio data from the moderator and the third audio data from the remote client(s)<br><br>"third mixed audio data"<br>Audio data that only contains a mix of both the first audio data from the PSTN client(s) and the third audio data from the remote client(s) |

The parties disagree as to whether mixed data ("mixed data stream[s]" and "mixed audio data") must be limited to specific combinations of data, or in other words, whether mixed data must exclude the data generated by the recipient of the mixed data.

Meetrix asserts that "modification by mere *addition* of elements or [sic] functions, whenever made, cannot negate infringement." *Amstar Corp. v. Envirotech Corp.*, 730 F.2d 1476, 1482 (Fed. Cir. 1984). Thus, Defendants cannot read into the claims the exclusion of additional elements or functions. Meetrix leans on the word "comprising" in the claims, which is "generally understood to signify that the claims do not exclude . . . factors in addition to those explicitly recited." *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 811 (Fed. Cir. 1999).

Defendants assert that the claim language is definitional, such that the claims require specific combinations of data. Defendants argue that the claim language, which mixes data from two conference participants and transmits that mixed data to a third participant, does not include mixing data from the third participant—the recipient—into the mixed data. '525 Patent at claims 1 and 2 ("transmits the first mixed data stream to at least one remote client"; "transmits a mixed audio data stream, corresponding to the second mixed data stream, to the PSTN client"; "communicates the third mixed data stream to the moderator"). Defendants also reference the relevant embodiment in the specification, illustrating mixers, each of which mixes data from only two of the three conference participants—excluding the data of the third participant. '525 Patent at 8:60–9:40, Fig. 6 (containing three mixers, each of which mixes data from two participants and transmits the mixed data to the third participant).

The court agrees with Meetrix that mere addition of elements or functions generally cannot negate infringement. *Amstar Corp. v. Envirotech Corp.*, 730 F.2d 1476, 1482 (Fed. Cir. 1984). The

29

court does not, however, read the word "comprising" as rendering all aspects of the claim "open" to the inclusion of additional elements. The word "comprising" "generally allows for additional, unclaimed steps in the accused process, but each claimed step must nevertheless be performed as written." *David Netzer Consulting Eng'r LLC v. Shell Oil Co.*, 824 F.3d 989, 998 (Fed. Cir. 2016), *cert. denied*, 137 S. Ct. 695 (2017). The term "comprising" cannot restore subject matter (for example, data or functionality) otherwise excluded from the claim. *See Kustom Signals, Inc. v. Applied Concepts, Inc.*, 264 F.3d 1326, 1332 (Fed. Cir. 2001) (finding that "an additional function" precluded literal infringement where the claim language required exclusion of that function); *Promega Corp. v. Life Techs. Corp.*, 773 F.3d 1338, 1341 (Fed. Cir. 2014), *rev'd and remanded on other grounds*, 137 S. Ct. 734 (2017) ("While the term 'comprising' in a claim preamble may create a presumption that a list of claim elements is nonexclusive, it does not reach into each [limitation] to render every word and phrase therein open-ended."); *Nat'l Oilwell Varco, L.P. v. Omron Oilfield & Marine, Inc.*, No. A-12-CA-773-SS, 2013 WL 8508579, at *7 (W.D. Tex. Aug. 30, 2013) ("[t]he open-ended transition 'comprising' does not free the claim from its own limitations.").

Claims 1 and 2 of the '525 patent do require exclusion of some subject matter—data from the recipient of the mixed data—from the mixed data. For example, claim 1 of the '525 patent "transmits the first mixed data stream [containing moderator audio-video data and PSTN client audio data] to at least one remote client." '525 Patent at claim 1. Claim 1 elsewhere references "remote client audio-video data," but it omits that data from the "first mixed data stream." *Id.* The specification also excludes remote-client data from mixed data that the remote clients receive. '525 Patent at Fig. 6. It is unclear why a conference participant would receive his own data, and Meetrix offers no reason why data from a recipient of the mixed data would be included in the mixed data. The

construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005). In this case, inclusion of the mixed-data recipient's data into the mixed data would not stay true to the claim limitations in light of the specification.

The claims do not, however, require the more limiting "only" in Defendants' proposed construction. Including "only" would negate infringement based on the "mere addition of elements or functions," and limit the claims beyond the extent provided by the claim language. *Amstar Corp. v. Envirotech Corp.*, 730 F.2d 1476, 1482 (Fed. Cir. 1984). With the exception of the data from the recipient of the mixed data, the claim language does not limit the mixed data to "only" the data explicitly recited.

Accordingly, the court construes "first mixed data stream" as **data stream that contains a mix of both the PSTN client audio data and moderator audio-video data but not remote client audio-video data**, "second mixed data stream" as **data stream that contains a mix of both the remote client audio-video data and moderator audio-video data but not PSTN client audio data**, and "third mixed data stream" as **data stream that contains a mix of both the remote client audio-video data and PSTN client audio data but not moderator audio-video data**. Similarly, the court construes "first mixed audio data" as **data that contains a mix of both the PSTN client audio data and moderator audio data but not remote client audio data**, "second mixed audio data" as **data that contains a mix of both the moderator audio data and remote client audio data but not PSTN audio data**, and "third mixed audio data" as **data that contains a mix of both the PSTN audio data and remote client audio data but not moderator audio data**.

*C.    Summary Table of Agreed and Disputed Terms*

| Term/Phrase | Court's Construction |
|---|---|
| "conferencing server" | **server for managing a conference** |
| "multicast appliances" | **devices that use a group address to send information to multiple locations via a single transmission** |
| "Virtual Private Network" (VPN) | **a private network of securely connected appliances configured within a public network** |
| VPN "tunnel" | **a connection between two devices that permits encapsulating a first packet from one protocol in a second packet from a different protocol.** |
| "Authenticating" | **verifying the authenticity of** |
| Argument that claim 11 of the '997 patent and its dependent claims are indefinite | **Indefinite** |
| "moderator" | **No construction necessary** |
| Preamble: "A non-transitory computer-readable medium including instructions for a multi-participant conference process to be executed by a local moderator computer" | **software instructions for performing a multi-participant conference, which are persistently stored in a form that a local moderator computer can read and execute** |
| "audio-video data stream" / "audio-video stream" | **audio and video data transmitted together in a continuous fashion.** |
| "mixed audio-video data" | **a mix of both audio and video data** |

| Term/Phrase | Court's Construction |
|---|---|
| "first mixer" | **a mixer that is not the second or third mixers** |
| "second mixer" | **a mixer that is not the first or third mixer** |
| "third mixer" | **a mixer that is not the first or second mixers** |
| "first mixed data stream" | **data stream that contains a mix of both the PSTN client audio data and moderator audio-video data but not remote client audio-video data** |
| "second mixed data stream" | **data stream that contains a mix of both the remote client audio-video data and moderator audio-video data but not PSTN client audio data** |
| "third mixed data stream" | **data stream that contains a mix of both the remote client audio-video data and PSTN client audio data but not moderator audio-video data** |
| "first mixed audio data" | **data that contains a mix of both the PSTN client audio data and moderator audio data but not remote client audio data** |
| "second mixed audio data" | **data that contains a mix of both the moderator audio data and remote client audio data but not PSTN audio data** |
| "third mixed audio data" | **data that contains a mix of both the PSTN audio data and remote client audio data but not moderator audio data** |

## IV. Conclusion

For the above reasons, the court construes the disputed claims as noted and so **ORDERS**.

No other claim terms require construction.

**IT IS FURTHER ORDERED** that this case is set for a **Scheduling Conference** on **January 18, 2018, at 9:30 a.m.**, in Courtroom 7, Seventh Floor, United States Courthouse, 501 W. 5th Street, Austin, Texas 78701. The parties shall meet and confer in advance of that date in an attempt to settle this case. If the case is not settled, the parties shall confer in an attempt to reach agreement on a schedule to follow for the remainder of this case. The court will render a scheduling order as a result of the conference.

SIGNED this /*st* day of December, 2017.

LEE YEAKEL
UNITED STATES DISTRICT JUDGE